IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:10CR181 |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND |
| ) | RECOMMENDATION |
| FRANCISCO GARCIA-AGUILAR, ) | |
| ) | |
| Defendant. ) | |

    This matter is before the court on the motion to suppress (Filing No. 18) filed by defendant Francisco Garcia-Aguilar (Garcia-Aguilar).  Garcia-Aguilar is charged in a four-count indictment for using an identification document, specifically a Social Security card and a Nebraska Identification Card, not issued lawfully for his use, in violation of 18 U.S.C. § 1546(b) (Count I); falsely representing himself to be a citizen of the United States on June 6, 2008, and on April 28, 2010, in violation of 18 U.S.C. § 911 (Counts II and III); and falsely representing a number to be his Social Security account number with intent to deceive, in violation of 42 U.S.C. § 408(a)(7)(B) (Count IV).  **See** Filing No. 1.  The defendant seeks to suppress statements made to law enforcement officers on April 28, 2010.  **See** Filing No. 18.  The defendant filed a brief (Filing No. 19) in support of the motion.  The government filed a brief (Filing No. 21) in opposition to the motion.

    On June 30, 2010, the court held an evidentiary hearing on Garcia-Aguilar's motion. Garcia-Aguilar was present with his appointed counsel, Assistant Federal Public Defender Jeffrey L. Thomas.  Assistant United States Attorney Debra K. Robinson represented the United States.  During the hearing, the court heard testimony from Kevin W. Archer (Special Agent Archer) of Immigration and Customs Enforcement (ICE).  A transcript (TR.) of the hearing was filed on July 7, 2010, whereupon the matter was deemed submitted.  **See** Filing No. 26.

**FINDINGS OF FACT**

    Special Agent Archer has been a special agent since 2004 (TR. 4).  Special Agent Archer has been working in his present capacity as an ICE agent since May, 2009 (TR. 4,

32). Special Agent Archer is authorized to enforce the immigration laws of the United States and has had training and experience in investigating charges of using false identification documents (TR. 4, 32). On April 27, 2010, Special Agent Archer received a tip through ICE's tip line from manager Bruce Holton (Mr. Holton) at Skylark Meats (Skylark), located at 100th and Maple Streets in Omaha, Nebraska, stating Skylark had received information one of its employees did not have legal documentation to work (TR. 6).

After contacting Mr. Holton, who provided the name Lazaro Ponce (Ponce), a date of birth, and a Social Security number, Special Agent Archer queried the information through a database called Clear (TR. 6). Through the search of the database, Special Agent Archer learned the Social Security number belonged to person named Ponce, but it appeared multiple people might be earning wages using the same Social Security number (TR. 7). When Special Agent Archer queried the name Ponce through the Nebraska Criminal Justice Information System (NCJIS), Special Agent Archer learned there was no significant criminal history for Ponce (TR. 7).

At approximately 9:00 a.m., on April 28, 2010, Special Agent Archer and ICE Special Agent Morral met in Mr. Holton's office at Skylark, where Mr. Holton showed the agents the anonymous tip, as well as Ponce's documentation provided for the Form I-9 (TR. 8). The Form I-9 contains a block for employees to check indicating whether they are United States citizens (TR. 33). On the Form I-9 for Ponce, there was a checkmark in the block for United States citizenship (TR. 36). In the kind of investigations Special Agent Archer engaged in, people commonly check the Form I-9 block indicating United States citizenship (TR. 33). Based on the documentation alone, Special Agent Archer thought he was dealing with a case of an illegal alien using false identification documentation (TR. 37).

Mr. Holton summoned the defendant into the office (TR. 8-9). In Mr. Holton's office, Special Agents Archer and Morral asked the defendant who he was and where he was born (TR. 9). The defendant answered his name was Lazaro Ponce and he was born in El Paso, Texas (TR. 9). Special Agent Archer expressed his skepticism that the defendant was not the real Lazaro Ponce because the Social Security number was issued from the state of Georgia (TR. 9). The defendant explained he had obtained the Social Security number when he went to Georgia (TR. 9). Since Special Agent Archer was uncertain about whether the

2

explanation was possible, Special Agent Archer stepped out of Mr. Holton's office and contacted an agent with the Social Security Administration, who confirmed it was possible to obtain a Social Security number in the manner described by the defendant (TR. 9).

Special Agent Archer returned to Mr. Holton's office and, in the attempt to build a timeline through his questions to determine if the defendant had a legal right to be in the United States, asked the defendant where he went to "grade" school (TR. 10). The defendant answered he went to Jefferson High School, which was not responsive to the question about where he went to grade school (TR. 10). The defendant could not provide answers about where he lived and with whom he lived (TR. 11). The defendant stated his mother was a United States citizen living in El Paso (TR. 11). The defendant could not or would not provide his mother's address or telephone number (TR. 11).

The defendant stated that after living in El Paso for seven years, he lived in Mexico for fourteen years (TR. 12). Special Agent Archer believed this was significant because it conflicted with the resume the defendant had provided to Skylark (i.e., whether he attended high school in 1997, at age twenty-one, or graduated in 1994) (TR. 12). The discussion about Mexico led Special Agent Archer to believe the defendant was more than likely an illegal alien because the defendant was more familiar with addresses and places of residence in Mexico rather than the United States (TR. 12).

Since the defendant did not provide sufficient information leading Special Agents Archer and Morral to believe the defendant had a legal right to be in the United States, the agents decided to transport the defendant to ICE's Detention and Removal Office (DRO) in order to query the defendant's fingerprints through an ICE database for automated biometric identification called IDENT, and an FBI database called IAFIS (TR. 12-13). Special Agent Archer told the defendant they were going to the ICE DRO (TR. 13). The defendant said, "You are going to take me?" (TR. 13). Then when Special Agent Archer attempted to handcuff the defendant, he said, "I'm not a fucking terrorist" (TR. 13). The defendant stood up, moved his body back, and assumed a defensive posture as if he might physically confront the agents (TR. 13).

Nevertheless, Special Agents Archer and Morral were able to handcuff the defendant and transport him to the DRO office (TR. 14). They left Skylark at approximately 9:30 a.m.

and arrived at the DRO at 9:54 a.m. (TR. 14, 52). The DRO is similar to a jail facility because weapons are checked before entering and there are several cubicles and holding cells in a large room (TR. 14). Special Agent Archer employed a number of databases while processing the defendant at the DRO in order to establish alienage and identity (TR. 15). If there have been any previous encounters that have been documented by an immigration officer, such encounters are logged into IDENT (TR. 15). An additional database called the Central Identification System (CIS) is used by ICE agents (TR. 16). CIS assists ICE agents in identifying aliens who were lawfully in the United States and helps identify whether an alien subsequently became a citizen (TR. 17). The processing also helps the agents determine how to proceed with the individual in terms of any criminal history or type of immigration proceeding to commence (TR. 17-18).

As part of the routine for immigration processing, the agents obtained the defendant's fingerprints (TR. 17-18). After obtaining the fingerprints, at 10:25 a.m., Special Agent Archer advised the defendant of his ***Miranda*** rights by reading from a rights form (TR. 30, 52-53). The defendant stated he would like to talk to an attorney (TR. 27).

Subsequently, Special Agent Archer made an inventory of the defendant's wallet, including the amount of currency (TR. 26-27). Special Agent Archer also inspected the contents of the wallet to attempt to establish alienage and identity and found an identification card (TR. 26). Special Agent Archer also found the defendant's Mexican driver's license and entered the defendant's name as Garcia-Aguilar into the immigration database (TR. 22). Special Agent Archer asked Garcia-Aguilar where he was born, where he was from, and what his parents' names were (TR. 22, 44-45). Special Agent Archer requested information about Garcia-Aguilar's parents because those facts were needed to help determine alienage and also served as routine booking questions (TR. 22). Special Agent Archer input the information from Garcia-Aguilar and the driver's license into the ENFORCE database (TR. 24). While Special Agent Archer was entering data into the database, Garcia-Aguilar was not handcuffed (TR. 25). However, Garcia-Aguilar was handcuffed and placed into a holding cell on a couple of different occasions during the process for being uncooperative and verbally combative by using offensive language (TR. 25-26, 42).

Based upon the fingerprinting analysis, Special Agent Archer learned the defendant, using the name Benjamin Cruz, had been arrested for a shoplifting crime by the Omaha Police Department (TR. 21). Moreover, Special Agent Archer learned the defendant received a voluntary return to Mexico by the United States border patrol on September 1, 2001, where he purported himself to be a Mexican citizen (TR. 21). This information led Special Agent Archer to believe the defendant was an illegal alien (TR. 21). By contrast, the fingerprinting did not substantiate the defendant's version of his identity and legal status (TR. 21). At this time, Special Agent Morral said words to the effect of, "The gig's up. . . We know who you are. You're Benjamin Cruz from Acapulco, Mexico. You're from Mexico" (TR. 22). The defendant responded, "Yeah, I'm Benjamin Cruz from Acapulco" (TR. 22).

Garcia-Aguilar was placed under administrative arrest, though Special Agent Archer did not have the authorization to criminally charge Garcia-Aguilar at that time (TR. 28-29). The Form I-213 and other booking and immigration forms are generated by the ICE processing system through the ENFORCE database (TR. 23-24). One such form, Form 862, is a charging document that scheduled Garcia-Aguilar to appear before an immigration judge (TR. 25). Garcia-Aguilar signed Form 826, which Special Agent Archer described as a "rights form" (TR. 28). Garcia-Aguilar refused to sign any other forms (TR. 28). Special Agent Archer did not question the defendant about where he obtained the documents provided to Skylark for employment (TR. 20-21). After completing immigration processing, at approximately 11:30 a.m., DRO officers kept Garcia-Aguilar in their custody (TR. 28, 42-52-53). Generally, at the completion of processing at the ICE DRO an illegal alien is transported to Douglas County Corrections and re-booked using information provided from immigration Form I-213 (TR. 23). Garcia-Aguilar's wallet was placed in an evidence bag and taken with Garcia-Aguilar (TR. 27).

## LEGAL ANALYSIS

The defendant argues the questioning by law enforcement arose to a custodial interrogation and, in the absence of a proper and sufficient waiver of *Miranda*, any statements the defendant made during the custodial interrogation should be suppressed. **See** Filing Nos. 18 and 19. The government argues Special Agent Archer's encounter with

the defendant and subsequent investigation occurred as a result of an administrative immigration inspection. **See** Filing No. 21. The government argues Special Agent Archer had reasonable suspicion to suspect the defendant was illegally in the United States. *Id.* Therefore, the government argues Special Agent Archer's investigation did not exceed his authority as an immigration officer and the defendant was not subject to a custodial interrogation. *Id.*

In the alternative, the government argues if the encounter were outside the scope of an administrative immigration inspection, the encounter was a *Terry* investigative detention supported by reasonable articulable suspicion. *Id.* The government argues the *Terry* investigative detention was reasonable in scope and duration. *Id.* Further, the government argues subsequent questioning at the ICE DRO was either a continuation of the *Terry* investigative detention or routine booking questions and the defendant was not subject to a custodial interrogation. *Id.*

Lastly, in the alternative, the government argues the doctrine of inevitable discovery applies. *Id.* The government argues the defendant's true identity and alienage would have been discovered during an inventory search of the defendant's property. *Id.* For these reasons, the government argues the motion should be denied.

### A.   Administrative Immigration Inspection and *Terry* Investigative Detention

One type of encounter between the police and a citizen is an investigative detention, which is a seizure of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity. **See, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Griffith*, 533 F.3d 979, 983-84 (8th Cir. 2008); *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007). An officer is allowed to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Saenz*, 474 F.3d at 1136 (**citing** *Terry*, 392 U.S. at 30). "Any detention consequent to an investigative stop must be temporary and must last no longer than necessary." *United*

*States v. Dickson*, 58 F.3d 1258, 1263 (8th Cir. 1995). "In deciding whether a detention lasts too long to be justified in an investigative stop, and therefore becomes an arrest, we consider whether the police 'diligently pursued' a means of investigation likely to resolve their suspicions quickly." *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "Generally, the police may take reasonably necessary steps to 'maintain the status quo of a situation while verifying or dispelling suspicion.'" *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)).

"The Fourth Amendment provides protection against random or gratuitous questioning related to an individual's immigration status." *United States v. Espinoza-Raya*, 2009 WL 5214500, at *2 (D. Neb. Dec. 21, 2009). However, "[i]mmigration agents are authorized under the statute to interrogate suspected aliens for possible violation of immigrations laws." *Id.*; **see also** 8 U.S.C. § 1357(a)(1). "If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is . . . an alien illegally in the United States, the immigration officer may briefly detain the person for questioning." 8 C.F.R. § 287.8(b)(2). Further, "immigration officers 'may make forcible detentions of a temporary nature for the purposes of interrogation under circumstances creating a reasonable suspicion.'" *Espinoza-Raya*, 2009 WL 5214500, at *2 (**quoting** *Au Yi Lau v. INS*, 445 F.2d 217, 223 (D.C. Cir. 1971) (applying principles of *Terry*, 392 U.S. 1)). "Utilizing the standards developed in *Terry*, such detentions are to be judged from case to case by reference to the particular facts of each." *Au Yi Lau*, 445 F.2d at 223.

The analysis about whether the defendant's initial encounter with the agents was constitutional under either an administrative immigration inspection or *Terry* investigative detention is similar because both types of encounters are subject to the reasonable suspicion standard. Special Agent Archer had the requisite reasonable suspicion, based on specific articulable facts, that an employee at Skylark was an illegal alien in the United States before meeting the defendant. Special Agent Archer received an anonymous tip that provided Special Agent Archer with a name of the employee, a Social Security number, and a date of birth. **See** TR. 6. Special Agent Archer queried the name through Clear, confirmed the Social Security number with the Social Security Administration, and entered the Social Security number into NCJIS. Special Agent Archer learned the Social Security number

belonged to Lazaro Ponce and it appeared multiple people might be drawing wages off the Social Security number. The information Special Agent Archer obtained provided him with reasonable suspicion to believe criminal activity was afoot, that is, an employee at Skylark was using false identification documentation and may be illegally in the United States.

Special Agents Archer and Morral's initial contact with the defendant at Skylark occurred as a result of their reasonable suspicion that the defendant was using false identification documentation. There is no indication Special Agents Archer or Morral made contact with the defendant merely to arrest the defendant. Special Agent Archer testified the encounter "was probably not going to end up in a criminal arrest." **See** TR. 7. Special Agents Archer and Morral approached the defendant to alleviate their suspicion about whether the defendant was legally within the United States. Special Agent Archer presented documents to the defendant which were used for the defendant's employment at Skylark and asked the defendant general questions about who the defendant was, where the defendant obtained the Social Security number, and where the defendant went to grade school. **See** TR. 8-15. Special Agents Archer and Morral were within their authority as immigration officers to ask questions concerning the defendant's alienage. **See** 8 C.F.R. § 287.8(b)(1). Throughout the questioning, the defendant provided inconsistent responses and maintained that he was Lazaro Ponce as the documents indicated. The defendant did not provide Special Agent Archer any information to substantiate the defendant's claim that the defendant was lawfully in the United States. Therefore, to confirm the defendant's alienage, the agents needed to query the defendant's fingerprints in the IDENT and IAFIS databases, a procedure Special Agent Archer could not perform at Skylark. The defendant was transported from Skylark to ICE DRO out of necessity to determine the defendant's identity. Special Agent Archer continued to have a reasonable suspicion the defendant was an illegal alien due to the defendant's inconsistent answers to Special Agent Archer's questions. The defendant's confrontational posture when Special Agent Morral informed the defendant that he was going with the agents to the ICE DRO reasonably required Special Agent Morral to place the defendant in handcuffs.

The defendant's questioning at Skylark was not a custodial interrogation requiring a *Miranda* warning. "[A] request for routine information necessary for basic identification

8

purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating." *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985); **see also** *United States v. Ochoa-Gonzalez*, 598 F.3d 1033 (8th Cir. 2010). The questions Special Agent Archer asked the defendant were for the purpose of discovering the defendant's identity and not for the purpose of a criminal arrest. Further, the defendant was not in custody during the initial questioning. The defendant was at his place of employment, the defendant was not handcuffed or restrained, and the special agents did not coerce the defendant.

Once at the ICE DRO, Special Agent Archer obtained the defendant's fingerprints as part of routine immigration processing. Obtaining the defendant's fingerprints served a dual purpose. Special Agent Archer would be able to identify the defendant and begin routine immigration processing. At 10:25 a.m., after Special Agent Archer entered the defendant's fingerprints, Special Agent Archer read the defendant his *Miranda* rights. The defendant then requested counsel and Special Agent Archer did not ask any further questions concerning the false identification documentation. Special Agent Archer made an inventory of the defendant's wallet and used the identification card and Mexican driver's license to enter the defendant's information in the immigration database. The only questions Special Agent Archer asked the defendant were routine booking questions necessary to complete immigration processing.

Although the defendant did not argue the length of the detention was unreasonable, this court finds the defendant's detention was reasonable in duration and scope. Transporting the defendant to the DRO lengthened the duration of the detention, but was a necessary step in alleviating Special Agent Archer's suspicion and determining the defendant's alienage. Questioning the defendant at Skylark, transporting the defendant to ICE DRO, and entering the defendant's information into the immigration database took approximately an hour and a half. The amount of time spent was not unreasonable considering the time it took to transport the defendant to ICE DRO, the time to prepare the immigration database, and the defendant's uncooperative behavior.

**B.     Inevitable Discovery Doctrine**

The government argues, in the alternative, Special Agent Archer would have inevitably discovered the defendant's identity and alienage during the inventory search of the defendant's property. **See** Filing No. 21. "The inevitable-discovery doctrine posits that if the prosecution can establish by a preponderance of the evidence that the information, otherwise to be suppressed under the exclusionary rule, ultimately or inevitably would have been discovered by lawful means, then the exclusionary rule does not apply." *United States v. James*, 353 F.3d 606, 616-17 (8th. Cir. 2003). After the defendant was arrested Special Agent Archer obtained the identification card and Mexican driver's license during an inventory of the defendant's property. Therefore, suppression of the evidence of the defendant's true identity would not be warranted.

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Francisco Garcia-Aguilar's Motion to Suppress (Filing No. 18) be denied.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to these Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of these Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 12th day of August, 2010.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge